**In re Robert T. HOLMES and Julie A. Holmes, Debtors.**

**Robert T. Holmes and Julie A. Holmes, Plaintiffs,**

v.

**Deutsche Bank National Trust Company, as Trustee of Ameriquest Mortgage Securities, Inc., Defendant.**

**Bankruptcy No. 06–50236.
Adversary No. 06–5035.**

United States Bankruptcy Court,
D. Minnesota.

March 13, 2009.

Peter Greenlee, Greenlee Law Office, Twig, MN, for Plaintiffs.

Bryan C. Keane, Monica L. Clark, Dorsey & Whitney LLP, Minneapolis, MN, for Defendant.

### MEMORANDUM DECISION AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for trial. The Plaintiffs (hereafter "the Debtors" if the reference is to both of them) appeared personally and by their attorney, Peter C. Greenlee. The Defendant (hereafter "Deutsche Bank") appeared by its attorney, Bryan C. Keane. The following decision is based on the full record, including certain testimony presented via video-recorded or transcribed deposition that was reviewed after the in-court evidentiary session.

### The Parties and the Nature of Their Litigation

The Debtors are husband and wife. They are residents of Duluth, Minnesota. They filed a voluntary petition under Chapter 7 on June 20, 2006. Their bankruptcy case is still pending in this Court.

Deutsche Bank holds the status of trustee under a securitization of mortgage-secured debt that includes all of the rights related to a mortgage against the Debtors' homestead in Duluth. The associated individual mortgage instrument is registered in the office of the St. Louis County, Minnesota Registrar of Titles. In the instrument, the mortgagee was identified as Ameriquest Mortgage Company (hereafter "Ameriquest").

The Debtors filed the complaint in this adversary proceeding on July 19, 2006. Through it, they seek declaratory relief, an adjudication that the mortgage originally granted to Ameriquest has no legal force and effect. Their theory for that relief is that Minnesota law required both of the Debtors to acknowledge the mortgage instrument, and Robert Holmes did not execute the signature in the form of his name that appears on the instrument.

For its part, Deutsche Bank answered by denying the Debtors' allegation that the signature was not that of Robert Holmes. It also raised the affirmative defenses of ratification by the Debtors and equitable subrogation to the rights of a prior mortgagee.

### Jurisdiction

As the Court determined before the trial, this adversary proceeding is a civil proceeding related to the Debtors' bankruptcy case. Thus, federal jurisdiction lies under 28 U.S.C. § 1334(b). *In re Holmes,* 387 B.R. 591, 598–600 (Bankr.D.Minn.2008). Both sides have consented to having a bankruptcy judge hear and determine this matter, and order entry of a final judgment. *See* 28 U.S.C. § 1334(c)(2).

### Decision

This matter is best treated in a sequential fashion, covering the Debtors' request for relief first. This part will include Deutsche Bank's challenge to the Debtors' theory of fact. Deutsche Bank's affirmative defenses will be considered second. Many of the relevant facts are transactional and documentary, objectively evidenced and routine in nature; the parties have stipulated to much of that. As it turns out, the ultimate fact-finding as to the Debtors' case and Deutsche Bank's defenses is straightforward as well. The real controversy lies in the legal consequences of the relevant acts and events.

### I. The Debtors' Case: Validity of Grant of Mortgage

#### A. Findings of Fact

The Debtors are husband and wife; they married in 1996. They have resided together in the property at 164 West Ideal

Street in Duluth for the whole term of their marriage, and have held title to it as joint tenants since 1997.[1]

In the late summer and early fall of 2003, the Debtors' household was in a state of growing financial strain. Over the years that they had owned and resided in the property at 164 West Ideal Street in Duluth, the Debtors had "refinanced" on at least two occasions. Each time they had drawn cash out of the ostensible value of the property via mortgage-secured loans. They had last done so in February, 2003, in a loan transaction in the face amount of $92,800.00. The post-closing servicer for this loan was Ocwen Federal Bank FSB ("Ocwen").

By the late summer of 2003, the Debtors "had already fallen behind on the mortgage," i.e., they were delinquent on the monthly payments for that loan. They were having difficulty paying other expenses and debts as well. Julie Holmes was then employed as a production aide at the Duluth location of Goodwill Industries, earning $750.00 to $800.00 per month net. Robert Holmes's only income at that time was approximately $600.00 per month in Supplemental Security Income ("SSI") from the Social Security Administration.[2] The current amount of their monthly mortgage payment to Ocwen was $951.00.

In Julie Holmes's words, the Debtors had a "dire need for cash," and "wanted to obtain some [more] on a refinance." They intended to apply any net cash proceeds of a loan to paying accumulated debts and, if possible, to home improvements.[3] Julie Holmes contacted several mortgage brokers or lenders by telephone. They turned her down, on the stated ground of insufficient value in the home. One of these contacts referred the Debtors to Ameriquest.

One of the Debtors telephoned Ameriquest at the office it maintained in Plymouth, in the Minneapolis–St. Paul metropolitan area. The record does not establish the specific date of this first contact. As a result of it, Mitchell Peterson, then employed by Ameriquest as an account executive, was assigned to the Debtors for any loan application they would make. During a telephone conversation on October 15, 2003, Peterson[4] took financial information from Julie Holmes.[5] He used this data in completing an electronic-format "Uniform Residential Loan Application" that Ameriquest maintained on its computer network system.[6]

As of October 15, 2003, Robert Holmes was in the custody of the Minnesota De-

---

1. A remark by Julie Holmes in testimony suggested that she had held the title in her sole capacity for years before the marriage.

2. Apparently Robert Holmes has worked sporadically as a barber, but he was not doing so at that time.

3. Under the "refinance" contemplated by Julie Holmes, the proceeds would have been net of a payoff of the full outstanding debt to Ocwen. That would resolve the Debtors' delinquency with Ocwen. Julie Holmes clearly contemplated that at the time.

4. Mitchell Peterson's supervisor at Ameriquest was one Jason Peterson. Jason Peterson's involvement with the Debtors' loan file

is not relevant to the dispute at bar. All further references to "Peterson," using the surname alone, will signify Mitchell Peterson.

5. Peterson testified that all of the subsequent pre-closing contacts between Ameriquest and the Debtors were via telephone, because Ameriquest's "market didn't hit that area," i.e., Ameriquest had no local office in Duluth.

6. As completed and eventually signed by Julie Holmes, this document was received into evidence as Defendant's Exhibit A and Plaintiffs' Exhibit 12.

partment of Corrections. He had been arrested on a probation violation during the first week of October. He was held initially at the MDOC facility at Lino Lakes, and then was imprisoned in the MDOC facility at Rush City. He was not released until mid-June, 2004. While Robert Holmes was imprisoned, he retained his eligibility for Supplemental Security Income but was not entitled to current payments of the benefit.

While Julie Holmes was going through the application process with Ameriquest, she was acting with the knowledge and consent of Robert Holmes though he was not physically present in the household. Julie Holmes had started her search for a new loan before his arrest, and with his complete agreement. While Robert was in custody, she told him she was continuing the search. She then told him about the application to Ameriquest as she was going through the process. He never told her to stop.

Peterson input the financial data from Julie Holmes into a software program proprietary to Ameriquest, along with a credit score for the Debtors, the amount of the loan requested by the Debtors, and other information. In his testimony for the trial, Peterson termed this program as a "com-puterized underwriter, basically." The program issued a response as to whether this application would qualify the Debtors for a loan under Ameriquest's standards, "in seconds," in what Peterson termed "a decision whether or not to issue a loan."[7] Under Ameriquest's procedures, if the program's response was positive, the account executive went ahead to prepare for a loan disbursement and to assemble the documentation for a loan and a grant of mortgage.[8]

Over the next six weeks, Julie Holmes and Peterson frequently contacted each other by telephone, to discuss the Debtors' loan application. Peterson proceeded to prepare documents to close a loan to the Debtors and eventually he made arrangements for a closing. Peterson knew as early as November 10, 2003, that Robert Holmes was then in custody.[9] Four days later, Peterson opined to his immediate supervisor, Jason Peterson, that "Holmes will not close. Ever."[10]

Around 8:30 p.m. on November 25, 2003, one Jill Ahlgren arrived in person at the Debtors' Duluth homestead, pursuant to arrangements she had made with Julie Holmes. Ahlgren was then employed as a "mobile closer" by a company called Great Minds, Inc., d/b/a Signature Closing Ser-

7. This phrasing is a characterization that Peterson conceded in cross-examination.

8. Peterson testified that the underwriting department at Ameriquest's central corporate offices would have had access to the Debtors' application and account file for the purposes of review, both before the closing and during the three-day period before disbursement. However, he did not know whether "Corporate looked at this file."

9. This is established by an e-mail message of that date from Peterson to Benjamin Jerulie, Ameriquest's area manager, in response to Jerulie's query as to "WHAT FILES HAVE VALUES ON THEM." In it, Peterson acknowledges that he would "have to close the spouse in jail." *See* Plaintiffs' Exhibit 26. (This exhibit was not among those to which the parties stipulated as to admissibility. However, enough foundation for it was laid through the deposition testimony of Peterson and thus it is received into the record. In any event, Peterson himself testified orally to the ultimate fact, his having been aware on that date that Robert Holmes was incarcerated then.)

10. This statement was made in an e-mail message. *See* Plaintiffs' Exhibit 27. Again, this exhibit was not covered by the parties' stipulation as to admissibility, but Peterson laid a foundation for it in deposition and it is thus received into evidence.

vices ("Signature"). Ameriquest had hired Signature to conduct the closing of the loan to the Debtors.[11] Ahlgren was a notary public; she had been assigned the responsibility to obtain the Debtors' signatures where appropriate on the various documents and instruments for the loan and the grant of mortgage, and to witness the act of signature. She had printed hard-copies of the documents for the loan from her computer, having retrieved them in e-format from a web access page maintained by Ameriquest. She also had in her possession the unsigned application under which the Debtors were to have requested the loan in the first place. Though (per Peterson's testimony) the initial application was "typically" prepared and signed by a borrower sometime before the closing on a loan, this one had not yet been presented to, reviewed, or signed by the Debtors.

When Ahlgren arrived at the Debtors' house, Robert Holmes was not there. He could not be there; he was in prison at Lino Lakes. Ahlgren had not known that he would not be there when she came. In Ahlgren's experience, it was "not unusual" for a joint signatory to be absent when a "mobile closing" was to be performed for Ameriquest. Her usual measure for that situation was to reschedule the closing. On occasion, though, she had taken the signature of only the party present, and then had prepared supplemental documentation to evidence that, deferring the taking of the other signature.

Ahlgren had Julie Holmes sign all of the documents she had brought, including the loan application, in Ahlgren's presence. These included the final page of the mortgage instrument. In her testimony at trial, Ahlgren erroneously termed this latter document "the vesting page." Actually, it was the signature page and the form notarial attestation as to the identity of the signatory or signatories of the instrument and their acknowledgment of their free act and deed in the execution. When Ahlgren had retrieved the mortgage instrument from the web page source, the notarial attestation page had been completely blank as to the names of signatories.

Following the general training she had received from Signature very literally, without reflection and by rote, Ahlgren hand-wrote "Julie Holmes and Robert Holmes, wife and Husband, As joint tenants" in the blank. This was a verbatim repetition of the recitation of the identity and status of the "Borrower" from the second page of the mortgage instrument. It is not clear whether Ahlgren formally notarized this page at that time, or after she returned to her house; in any event, she did so under a date of November 25, 2003.

The package of documents had been prepared to reflect Julie Holmes as the sole party named on the promissory note, and hence the only one of the Debtors to be contractually liable on the debt.[12]

However, several of the documents had been drafted to require the signatures of both of the Holmeses: the mortgage instrument, a Truth in Lending disclosure statement, the notice of right of rescission under the Truth in Lending Act, and a "Signature/Name Affidavit" used to attest to the alternate forms of personal name(s) used by a signatory to instruments in a mortgage transaction. As long as they were in Ahlgren's hands, none of these documents bore a hand-signature or handwritten initials purporting to be those of Robert Holmes. When Ahlgren was with

---

**11.** Peterson testified that Ameriquest "hired mobile closers to close all [its] loans."

**12.** For the apparent reason for this, *see* findings at pp. 642 and 643–44 *infra*.

Julie Holmes, she did not instruct her to place a signature in the name of her husband onto any document. Julie Holmes did not do that on any of the documents. Ahlgren did not travel to the MDOC facilities in Rush City or Lino Lakes to procure Robert Holmes's signature.

When Julie Holmes executed the "Signature/Name Affidavit," Ahlgren hand-wrote "Julie Holmes/Julie Ann Holmes/Julie A. Holmes" in the blank space for the statement that the persons bearing those forms of name were "one and the same person." Ahlgren did not add any reference to Robert Holmes, because he had not signed this document before her. As long as the document was in Ahlgren's hands, it had no hand-written reference to Robert Holmes, or any signature in his name.

After Ahlgren returned home, she realized that the recitation that she had hand-completed on the notarial attestation page was factually wrong. So, she composed and signed an additional statement of her own. In pertinent part, this reads:

> I witnessed only the signature of Julie Holmes on that day, and the signature(s) of none other than her for the loan closing package belonging to her and her husband, Robert Holmes, who was not present at the West Ideal Street house on that particular day.

At trial, Ahlgren called this "an individual acknowledgment form that [she] made up." She intended this document "to be filed or to let anyone know that only one signed" the mortgage instrument in her presence as notary, out of the two signatories named in the text of the instrument.

Ahlgren then sent the package of documents to Signature's office in the Twin Cities. At that time, the documents had the actual signature of Julie Holmes affixed throughout; however, they lacked any signature under the name of Robert Holmes at any place where that was to be furnished.

Within several days after Ahlgren's visit, Julie Holmes found out from her husband that he had not yet received any documents for his signature at the prison. She advised Peterson of that soon thereafter.

No one ever procured a signature from Robert Holmes himself on any of the documents, including the mortgage instrument. No one made arrangements to visit him at the prison in Rush City to obtain his signature; no one ever appeared there for that purpose, for the duration of his six-month imprisonment. Nor was any package of documents ever sent to Robert Holmes at Rush City via mail or delivery service, for his execution before a notary but outside the presence of an agent of Ameriquest.

However, when a mortgage instrument identified to a loan made by Ameriquest to the Debtors on November 25, 2003, was filed at the office of the Registrar of Titles of St. Louis County on December 26, 2003, it bore a hand-written signature and initials purporting to be those of Robert Holmes. There was no notary's certification for the mortgagee's signatures other than the one that Ahlgren had affixed on November 25, 2003. It is uncontroverted that Robert Holmes did not execute these markings.

It is also uncontroverted that Robert Holmes has never signed an instrument granting a mortgage against the Debtors' homestead to Ameriquest.

### B. Conclusions of Law

In pertinent part, MINN.STAT. § 507.02 provides, in pertinent part:

> If the owner is married, no conveyance of the homestead, except a mortgage for purchase money ... shall be valid without the signatures of both spouses. A spouse's signature may be made by the spouse's duly appointed attorney-in-fact.

A grant of a mortgage is a "conveyance" within the meaning of this statute. MINN. STAT. § 507.01.[13]

■ For the better part of a century, the appellate construction of MINN. STAT. § 507.02 and its predecessors provides for a simple and entirely logical consequence:

A mortgage, in writing, given by one spouse on a homestead, while both are living, is void, unless given for purchase money.

*Kingery v. Kingery*, 185 Minn. 467, 241 N.W. 583, 584 (1932). *See also Butler Bros. Co. v. Levin*, 166 Minn. 158, 207 N.W. 315, 316 (1926); *Marr v. Bradley*, 239 Minn. 503, 59 N.W.2d 331, 333 (1953). Thus, where a mortgage instrument bears the actual signature of only one of the spouses who occupy the subject property as homestead as of the date of the mortgage, there is no grant of mortgage unless the loan to be secured is for purchase money. This is so whether there is only one signature on the mortgage instrument, *Wells Fargo Home Mortgage, Inc. v. Chojnacki*, 668 N.W.2d 1, 3–4 (Minn.Ct.App. 2003), or the instrument bears signatures purporting to be those of both spouses but one signature is a forgery, *Anderson v. First Nat'l Bank of Pine City*, 303 Minn. 408, 228 N.W.2d 257, 259 (1975).

■ Under that legal authority, the outcome of this portion of the analysis is virtually a forgone conclusion. Robert Holmes never granted anyone a power of attorney to affix his signature to a mortgage instrument. He did not sign the instrument in question here. The signature on it that purports to be his is a forgery.[14]

Jill Ahlgren did not forge it.[15] Julie Holmes did not affix the signature in the form of her husband's name,[16] but even if she had that would not matter.[17]

---

**13.** The relevant text of this statute is:

The word "conveyance," as so used, includes every instrument in writing whereby any interest in real estate is created, aliened, mortgaged, or assigned or by which the title thereto may be affected in law or in equity . . .

**14.** For a good portion of this litigation, Deutsche Bank held forth the possibility that Signature, or Ameriquest, or someone, had procured Robert Holmes's own inked signature on the document at some point after Ahlgren witnessed Julie Holmes's execution of the document. The testimony of the Minnesota Department of Corrections case manager assigned to Robert Holmes at Rush City in 2003–2004 was taken by deposition and received into the record. It closed off one avenue for Deutsche Bank: over the eight months of his imprisonment, Robert Holmes was visited in-person twice by his wife, once by an attorney, and by no one else. The other avenue, a transmittal of the mortgage instrument by mail, was ruled out by the evidence. The MDOC case manager could not speak to whether Robert Holmes had received a mailed packet of documents during his imprisonment; the MDOC's records for a prisoner's receipt of any non-legal mail are purged after a year. However, Robert Holmes testified unequivocally to never having received such a packet; Ahlgren testified she never made such a mailing; and Peterson was completely unable to speak to whether such a mailing had ever been done by anyone at Ameriquest or Signature. Deutsche Bank failed a basic burden of production on this point of fact.

**15.** She flatly and cursorily denied affixing a signature in Robert Holmes's name to the document. Deutsche Bank's counsel left that alone, in cross-examination.

**16.** This witness summarily denied signing her husband's name to the document. There was no concerted effort in cross-examination to get behind that, either.

**17.** In *Anderson v. First Nat'l Bank of Pine City*, one of the spouses forged the signature of the other, i.e., she signed the mortgage instrument using his name, without his knowledge and consent to the act of encumbrance. Clearly, in the eyes of the Minnesota Supreme Court the fact that the forgery was

It is not necessary to determine just who inked the purported signature of Robert Holmes; nor is it possible to make such a pointed finding on the evidence of record.[18] However, it is obvious that the forgery occurred between the time that Signature's Twin Cities-area office received the partly-signed document from Ahlgren, and the time that Peterson or a co-worker sent the document to St. Louis County for registration. And, because the document was in the exclusive control of Ameriquest or its agent Signature from the time when Ahlgren forwarded it until its submission for registration, somebody within one of those two entities effected the forgery.[19]

The purported mortgage here was not to secure purchase-money financing. Because it did not have the signatures of both of the two spouses who owned the subject real estate as their homestead, the November 25, 2003 instrument was ineffective to convey a mortgage to Ameriquest.

done by a co-owner spouse during coverture made it no less of a forgery.

18. At trial, one Cassandra Balthasar, an employee of the "former parent company of Ameriquest," testified that her own investigation had been inconclusive; she "could never confirm who actually signed the mortgage on behalf of Robert Holmes, who put his name there." On cross-examination, she admitted that her investigation had not been extensive.

19. The pronouncements in the last two sentences of the paragraph above are findings of fact. During the course of his testimony in deposition, Peterson flat-out denied affixing the signature himself, or directing somebody else to do it. Peterson's video-recorded testimony does not merit an unalloyed assignment of unassailable credibility: he gave his answers in response to leading questions; his answers to many relevant questions were a waffling "I don't believe so, no"; he turned away or looked down to avoid eye contact with the interrogating attorney whenever he had to answer any question going to the ultimate fact, i.e., who did the forgery. Peterson

## II. Deutsche Bank's Case in Defense: Estoppel/Ratification and Equitable Subrogation

### A. Findings of Fact

During the several telephone conversations between Julie Holmes and Peterson during October and November, 2003, Julie Holmes orally disclosed to him the status of her employment at Goodwill, the amount of her income from it, and the fact that Robert Holmes was not receiving SSI payments while he was imprisoned. She told Peterson that her intent was to have Robert Holmes as a co-borrower on the loan, and that she understood that Robert would have to sign the documents. In response to the disclosure that SSI was not being disbursed to Robert currently, Peterson broached the idea of having Julie Holmes be the only named borrower on the loan.[20] He also suggested to her that Robert's name be removed from the title

acknowledged that other employees of Ameriquest had access to the file for the Debtors' loan before he sent the mortgage instrument for registration. He denied having any current memory of any of the details of his involvement with the Debtors' account. He also denied nearly all knowledge or memory of how Signature's Twin Cities-area office did handle or would have handled the procurement of the necessary signature under the novel circumstances presented. Neither side presented expert analysis of the handwriting of the signature. Given the inconclusiveness of the evidence, it is not possible to make a finding that Peterson himself forged the signature. However, there is no way to infer that anyone other than some agent or employee of Ameriquest or Signature did it.

20. Around the same time, Robert Holmes called Peterson from prison. He told Peterson that he would not receive SSI payments as long as he was there. Peterson replied that Ameriquest would "not need [his] income," that it would "just use Julie's," and that Ameriquest would "do the loan with [his] wife alone."

of the house, via the execution of a quit claim deed. This latter expedient, however, was never taken.

After Peterson received and evaluated the information from Julie Holmes, he told her that she would not qualify for a loan based upon her income from Goodwill Industries alone. After that, at some point prior to November 25, Peterson dictated a statement to Julie Holmes, word by word. From her conversations with Peterson, Julie Holmes understood that she was to handwrite this statement, to sign it, and to submit it as part of her documentary submission to Ameriquest, if the Debtors' request for a loan was to go forward. In its entirety, and as prescribed by Peterson, this statement reads:

> November 25, 2003
>
> To: WHOM IT MAY CONCERN,
>
> I Julie Holmes work as a housekeeper and make $2,500.00 per month.
>
> Julie Holmes.
>
> 11/25/03 [21]

Ameriquest did not actually receive this document until after Ahlgren witnessed Julie Holmes's signatures. Apparently Peterson intended the statement to serve as an addendum to the form loan application sent through Ahlgren.[22] In deposition, Peterson acknowledged that the submission of such a statement was a requirement under a "stated income loan program" that Ameriquest ran as part of its underwriting practices at the time. Under it, Ameriquest purported to rely on prospective borrowers' unsworn written statements of their pre-tax

income alone, "rely[ing] on the honesty of the borrower as to what they make a month." It did not require documentary corroboration of the applicant's representations via pay stubs, W–2 forms or tax returns, or employer verification.

The factual recitations in this statement were false, both as of the date when Julie Holmes wrote it and as of November 25, 2003. Julie Holmes was not employed as a "housekeeper." She had no source of income other than her wages from Goodwill Industries. Peterson knew both of those things. At trial she stated that she complied with Peterson's instructions for this statement because she "was in a bind" financially, and without a refinancing of the existing mortgage loan she "wouldn't have been able to survive in [her] house with [her] little one," i.e., her young daughter.[23]

When Ahlgren presented the form loan application to Julie Holmes on November 25, 2003, she signed it as directed. She did not notice the printed content at the top of the second page, under "MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION," that recited a "Base Employment Income" of "$2,000.00" for her, and "Other" income of $678.96 from an unidentified source.

As Julie Holmes had gone forward through the process of application to Ameriquest, she had expected to receive "$15,000.00 clear" on the closing of a loan. As it turned out, when she received a check in the mail from Ameriquest about

---

**21.** The document itself is in evidence as Plaintiffs' Exhibit 17 and Defendant's Exhibit B.

**22.** The form loan application was received into evidence as Plaintiffs' Exhibit 12.

**23.** In his deposition testimony, Peterson repeatedly stated that he had "never told [Julie

Holmes] to falsify anything." These answers were given in response to leading questions on direct examination. Peterson looked down every time he gave this answer. And he never denied the ultimate point of fact here, whether he had prescribed and dictated the content of the statement.

two weeks after the ostensible loan closing, it was in the face amount of $5,716.01.[24]

The borrower on all of the loan documents was identified as Julie Holmes alone. Contrary to that, the check was made payable to both Debtors, in the conjunctive. After receiving the check, Julie Holmes had a telephone conversation with her husband. He told her that he "had no idea [he] was on the loan." He orally granted her permission to endorse the check in his name. Julie Holmes did so and deposited the check in the Debtors' bank account on December 8, 2003. She sent a small amount of cash to Robert Holmes for use through his inmate account at prison. Other than that, the funds were applied to the concurrent needs of the Debtors' household as Julie Holmes identified them.

At some point after Ahlgren's visit, Julie Holmes "began to have suspicions" that her husband's signature had been forged on the documents, or would be. When she inquired of this to Peterson, he told her not to worry, and that Ameriquest had "the necessary papers with Robert's signature." After Robert Holmes was released from prison, he told his wife that "it wasn't his signature" on the mortgage instrument or other documents.

Since receiving the proceeds of the loan in early December, 2003, the Debtors have not made a single payment of principal and interest to Ameriquest. During that time, they have not made any payment of real estate taxes on their house. Nor did they make any arrangements for casualty (homeowner's) insurance, or pay any premiums on such coverage. As to the latter, Ameriquest obtained so-called "forced placement insurance" to cover its interest in the Debtors' house from casualty loss. It has paid all of the premiums on the coverage, throughout. It has also paid the real estate taxes on the property as they have become delinquent.

### B. Conclusions of Law

By way of affirmative defense, Deutsche Bank argued that equity should override law on the facts presented: that even if the statutory requirement for the attachment of the mortgage were lacking, the Debtors should be barred from denying the existence of a secured position for Ameriquest and Deutsche Bank. It suggests two different equitable remedies to bind the Debtors to the impressment of a mortgage against their homestead.

First, Deutsche Bank argues ratification-and-estoppel, i.e., that the Debtors ratified the attachment of a mortgage by their conduct after the closing, and therefore are estopped from denying it.

The Minnesota Court of Appeals rejected this argument in a situation involving a homestead mortgage signed by only one of two owner-spouses, in *Wells Fargo Home Mortgage, Inc. v. Chojnacki*, 668 N.W.2d at 5. While the facts here are a bit different from those in *Chojnacki*, the same analysis applies.[25] In particular, as in

---

**24.** The check is in the record as Plaintiffs' Exhibit 16. Per an undated HUD settlement statement in the record as Defendant's Exhibit S, Ameriquest was to charge the Debtors for a "Loan discount" of 3.265%, a "Lenders Processing fee," "Admin," and an "Application Fee," all totaling a little over $5,000.00, plus an advance payment of $916.80 for the pro rata share of interest to accrue in December, 2003; then, there were the customary closing costs paid to third parties, for an

appraisal, insurance, real estate and deed stamp taxes, title insurance, and the like. Defendant's Exhibit W, a different summary of disbursements, was apparently prepared as Ameriquest's internal itemization. It shows payment made to two judgment creditors of Julie Holmes, in addition. The numbers for given line-item disbursements do not tie back and forth between these documents.

**25.** *Chojnacki* did not involve a forged signature—rather, the complete lack of one of the

*Chojnacki,* the spouse who did not execute the mortgage was surprised to learn about the execution of the mortgage instrument when that fact was first disclosed to that spouse after the execution; he never espoused the act of signature on the instrument; and he never objectively acquiesced to the act of attachment, before or after the transaction. 668 N.W.2d at 5.[26]

In any event, the alternate, policy-based rationale enunciated in *Chojnacki* lies just as readily here:

> [MINN.STAT. §] 507.02 unambiguously requires the signatures of both spouses for non-purchase-money mortgages. To hold that [the non-signing spouse] is estopped from asserting the protection of the requirement would be to circumvent the requirement[,]

in contravention of the dictate that a "court of equity will not disregard statutory law or grant relief prohibited thereby." *Id.* (citing *Kingery v. Kingery,* 241 N.W. at 584) (internal quotes omitted). *See also Butler Bros. Co. v. Levin,* 207 N.W. at 316.

Thus, neither of the Debtors is estopped from challenging the validity of the mortgage lien Deutsche Bank asserts, and in particular Robert Holmes is not.

▇▇▇ In the alternative, Deutsche Bank urges that it be equitably subrogated to Ocwen's secured position. It argues that it should "succeed in substitution to the rights and position of the secured cred-

itor," because the proceeds of its loan advance were used to discharge the Debtors' debt to Ocwen. *See Chojnacki,* 668 N.W.2d at 5 (citing *First Nat'l Bank of Menahga v. Schunk,* 201 Minn. 359, 276 N.W. 290, 292–293 (1937)). To claim the benefits of this succession, however, Deutsche Bank must have "acted under a justifiable or excusable mistake of fact" in enabling the satisfaction of the Ocwen debt; and, it must establish that it was an "innocent party" that otherwise would be injured. *Carl H. Peterson Co. v. Zero Estates,* 261 N.W.2d 346, 348 (Minn.1977), cited in *Chojnacki,* 668 N.W.2d at 5.

This is the point where Peterson's actions toward procuring an inked second signature are crucial. The specific nature of those actions is still unclear, due to Peterson's professed lack of memory and the lack of contemporaneous documentation. It was patent, however, that the situation after Ahlgren's semi-aborted effort to close was unique and challenging. And it is certain that Peterson was aware of the difficulty before Ahlgren went to the Debtors' house, he already knowing that Ameriquest would have to "close the spouse in jail." Despite that, no Ameriquest employee took proper, strict measures to ensure that Robert Holmes actually signed the instrument.[27] Instead, from the evidence presented, it was almost as if a fully-executed mortgage instrument just appeared in the file one day. Whether the

---

two signatures required under MINN. STAT. § 507.02, even as the instrument referred to the named signatory as a "married person." However, this is a distinction without a difference. The ratification defense does not turn on the facial content of the instrument, or on the putative *mortgagee's* treatment of the instrument as presented. The actions relevant to the question of ratification are those of the putative mortgagor.

**26.** And even if Robert Holmes had fully known that the transaction would go ahead

without his signature, he would not be estopped. *Kingery v. Kingery,* 241 N.W. at 584–585 (oral promise by one spouse to grant mortgage on homestead does not give rise to an estoppel).

**27.** Making arrangements with prison administrators to present a hard-copy of the instrument to Robert for signature before a notary might have been laborious under MDOC security procedures. But there is no evidence that it would have been impossible.

forgery was perpetrated by someone within Signature, or by an employee of Ameriquest, the fact of a false signature was apparent and undeniable just before the document was forwarded for registration. Peterson knew that Robert Holmes could not have been present before Ahlgren to sign and acknowledge the instrument, as the registered form of it purported to evidence, and there was no separate notary's certificate for the signature that purported to be Robert's.[28]

Signature was Ameriquest's agent for the services it performed for the closing; so, if someone within Signature worked the forgery, Ameriquest was bound by Signature's actions.[29] And if someone at Ameriquest did it, Ameriquest was directly bound by the act of forgery. In either case, Ameriquest had not "acted under a justifiable or excusable mistake of fact," i.e., a defensible assumption that Robert Holmes himself had put a pen to the mortgage instrument. And it could have no claim to "innocent party" status; the actions of its employees were grossly reckless at best, and overtly fraudulent at the extreme.

Given what Peterson knew, there is no forgiveness in equity for Ameriquest's failure to obtain a valid signature from Robert Holmes before it effectuated a loan that was to be secured by a homestead mortgage. *Chojnacki*, 668 N.W.2d at 6. And Deutsche Bank, as a successor-in-interest to Ameriquest via assignment, is bound by its assignor's conduct. Deutsche Bank cannot be given the benefit of a substitution into Ocwen's position.[30]

*Outcome*

The Debtors proved their entitlement to a judgment that the registered mortgage against their homestead is null and void,

**28.** It is significant that the form of the mortgage instrument actually presented for registration lacked the supplementary notary's statement that Ahlgren prepared and forwarded to Signature's Twin Cities office. As found earlier, Ahlgren did send it to Signature; but per the testimony of a witness for Deutsche Bank, the document was not in Ameriquest's file for the Debtors' account when he reviewed it for the trial. To the same effect, it is even more damning that Ameriquest's file contained two versions of the executed "Signature/Name Affidavit" noted *supra* at p. 639–40. Both purport to bear the signature of Robert Holmes. One appears to have come first in time after Ahlgren witnessed the signature of Julie Holmes. It recites the name of Julie Holmes alone in the text at the bottom, through which the signatory states that the persons bearing the several variant forms of name "are one and the same person." The second has the handwritten addition of "Robert Holmes + Robert T. Holmes" to the subjects of this declaration. Deutsche Bank did not offer an explanation why a variant form of this document was generated. But it is clear, and thus now inferred, that someone altered the content of the key textual recitation after it was notarized, and after the initial, post-notarization alteration that added a signature under Robert Holmes's name. (These documents are in evidence as Plaintiffs' Exhibits 24 and 25. Counsel for Deutsche Bank acknowledged that both of them had come from Ameriquest's file.) Finally, it is not insignificant that all of these documents were generated not long after Peterson had stated to his manager that a loan to the Debtors would not close, "[e]ver." This wording is properly construed as despairing, particularly since it comes after Peterson's lament, "all my deals are dead dude."

**29.** At the end of the trial, Deutsche Bank's counsel acknowledged that, as a matter of law, Signature had been Ameriquest's agent for all the services it rendered.

**30.** For its equitable-subrogation defense, Deutsche Bank relied heavily on *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616 (Tex. 2007). Apart from the fact that it cannot be binding precedent, this decision does not speak to the factor decisive here: Ameriquest's status as an "innocent party." It is only a general statement for the proposition that the law—and there, the law of the state of Texas—does not bar the application of equitable subrogation to homestead property.

for want of a signature required under Minnesota law. Deutsche Bank is not entitled to any relief in equity that would override that result.[31]

*Order for Judgment*

On the findings of fact and conclusions of law just memorialized,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The mortgage purportedly granted in favor of Ameriquest Mortgage Company against the following-described land:

Lots 4 and 5, Block 6, Highland Gardens, Second Division, St. Louis County, Minnesota,

under an instrument registered in St. Louis County, Minnesota, in the office of the Registrar of Titles, as Document No. 767953.0, on December 26, 2003, is null and void, because it does not bear the true, actual signatures of both Julie Holmes and Robert Holmes, the purported mortgagors.

2. The Defendant is not entitled to any relief in equity to supercede the adjudication in Term 1.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

31. The whole thrust of Deutsche Bank's equitable defenses is that it would be an unjust windfall to the Debtors to let them keep their homestead free and clear of a mortgage lien, after they got the benefit of Ameriquest's extension of credit. The whole thrust of today's rulings is that a mortgagee's knowing parlay of a forged mortgage instrument is not to be suffered—and that is fully supported by Minnesota statute and case law precedent. Even Julie Holmes's complicity with Peterson in submitting a misstatement of her income at the Ahlgren-conducted closing does not override the mandate for that result.